Joseph L. ALLSBROOK, Jr.

v.

The UNITED STATES.

No. 472–81C.

United States Claims Court.

Dec. 8, 1982.

Gregory A. Giordano, Virginia Beach, Va., for plaintiff; Frederick T. Stant, Jr. and Clark & Stant, Virginia Beach, Va., of counsel.

Marsha D. Peterson, with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant; Timothy K. Dowd, Naval Sea Systems Command, Washington, D.C., of counsel.

## ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

### OPINION

WIESE, Judge.

At issue in this appeal is a decision of the Merit Systems Protection Board ("MSPB" or "the board") which had allowed, but only in part, plaintiff's claims for reinstatement and back pay. The board found an unlawful suspension in that portion of an enforced leave period which was continued after the rejection of plaintiff's application for disability retirement; as to the preceding period of the enforced leave, the claims were dismissed. The appeal

challenges the correctness of the dismissal. The case is before the court on cross-motions for summary judgment.[1] Upon consideration of the record, the parties' submissions and without oral argument, we grant, in part, plaintiff's motion for summary judgment and remand the matter to the board for further factual determination.

## FACTS

Plaintiff, Joseph L. Allsbrook, Jr., has been employed as a fire control mechanic and electronics mechanic at the Norfolk Naval Shipyard ("the shipyard" or "the agency") since August 1966. On August 12, 1977, he was ordered to undergo a "fitness for duty" medical examination which revealed a deterioration in vision from a preexisting eye impairment. As a result, the shipyard physician imposed permanent monocular restrictions on plaintiff: he could do no work above ground or deck level, could not work at high levels or on outside hull staging or scaffolding, could not engage in work involving unguarded moving machinery, could not operate motor vehicles and could not engage in tasks presenting an unusual hazard to the eyes. In light of these restrictions, the medical officer deemed plaintiff not qualified to perform the full duties of his payroll title; an "altered fitness work assignment" was recommended.

On August 16, 1977, plaintiff was placed in a paid leave status pending efforts by the shipyard to find other duties for him that would accommodate his handicap. This status changed to leave without pay on August 31, 1977 after accumulated annual and sick leave had been exhausted. On August 30, 1977, plaintiff filed an application for disability retirement compensation; on March 24, 1978, the application was disapproved on the ground that the "[m]edical disorder involved is not disqualifying for full performance of duties of the employee's position under qualifications standards." The shipyard was advised accordingly; plaintiff, however, was continued on enforced leave, i.e., in a leave without pay status.

Two months later (May 24, 1978) the agency advised plaintiff that it proposed to initiate proceedings to remove him from his position. This contemplated action was based, not on medical grounds, but upon the agency's belief that he had stolen Government property.[2] A decision sustaining this charge was entered on June 21, 1978. Plaintiff appealed. On September 24, 1978 the reviewing authority, the Federal Employee Appeal's Authority, reversed the agency's removal action because of "fatal procedural error" and, at the same time, recommended that the decision to remove plaintiff be cancelled.

This recommendation was not followed. Rather, on October 3, 1978, plaintiff was again advised that proceedings to effect his removal would be initiated—and again, for essentially the same reasons, namely, his alleged theft of Government property. Plaintiff was afforded an opportunity to reply to the charges brought against him. On December 1, 1978, the agency decided that, though the charges had been established, his removal would not be carried out. Instead, he was to be suspended for a period of 20 days effective December 8, 1978. Thereupon, plaintiff filed a grievance (pursuant to the shipyard's contract with the employees' union); on November 13, 1979 the grievance was granted. The arbitrator found not only that the agency had repeated the same procedural errors that had required invalidation of the first removal action but also—and perhaps more impor-

1. Appeals from final orders or decisions of the Merit Systems Protection Board involving events occurring before January 11, 1979 (the case here) are governed by prior law rather than the Civil Service Reform Act of 1978, Pub.L. No. 95–454, § 902(b), 92 Stat. 1111, 1224; *Gaskins v. United States*, 221 Ct.Cl. 918 (1979). Accordingly, jurisdiction of the instant suit inheres in the United States Claims Court (under 28 U.S.C. § 1491, as amended by the Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, § 133, 96 Stat. 25, 39–40), rather than in the United States Court of Appeals for the Federal Circuit.

2. The record does not establish the date or dates of the alleged theft other than in broad fashion, i.e., "prior to 30 March 1978".

tantly—that the case was lacking on its merits. The arbitrator held: "[a]t most the facts might call for a conclusion that Grievant [plaintiff] had unauthorized possession and even that conclusion is subject to question." The agency was directed to cancel the suspension and to strike all references to that suspension from plaintiff's file.

Although plaintiff had twice successfully overcome the agency's efforts to remove him, in practical terms little had been accomplished for throughout the course of the months involved (May 1978 through November 1979) plaintiff's enforced leave status remained unchanged. And so had the status of his disability retirement application. As to this last, the record indicates that, following the initial rejection of his disability application on March 24, 1978, plaintiff had moved for reconsideration (this was in April 1978) and on November 16, 1978, the initial rejection was reaffirmed. Thereafter, plaintiff appealed to the Civil Service Commission (now the Merit Systems Protection Board) and on May 18, 1979, the denial was sustained. The Commission found that plaintiff was not "totally disabled for useful and efficient service in his position at the time of his application for disability retirement." Reconsideration of this decision was sought in July 1979; on October 18, 1979, the same was denied.

As of November 1979 then, plaintiff's application for disability retirement had been rejected (with no further rights to an appeal), the agency's efforts to accomplish his removal had also been conclusively rejected and his enforced leave status (begun in August 1977) continued unabated. It was with affairs in this posture that plaintiff filed an appeal with the Merit Systems Protection Board on July 31, 1980. His claim was that the enforced leave was, in reality, a constructive removal or a suspension of more than 14 days and, in either case, an unlawful adverse action—one carried out without benefit of procedural safeguards that had been inspired and continued solely for personal, disciplinary reasons rather than because of his physical restrictions. The board sustained the claim with respect to that portion of the enforced leave that had been allowed to continue after the final rejection of plaintiff's disability retirement application; relief for the period preceding that event was denied. At issue now is the board's partial denial of relief.

## DISCUSSION

■ In its assessment of the facts of this case, the board saw in the agency's twice-aborted efforts to effect plaintiff's removal plain signs of wrongful purpose. The events underlying those efforts need not be aired again here. It will suffice to say that, in terms of their factual content, the removal actions revealed more than enough to support the board's principal finding that plaintiff's "enforced leave was used in a personal disciplinary type of situation as the agency's line manager, Mr. Martin, [had] determined that the appellant should not be returned to work and his removal from the service effected for what he truly [but erroneously] believed was just cause."

This finding identifying the line manager's personal stake in events[3], together with the board's flat rejection of the agency's testimony alleging plaintiff's unsuitability for retention (because of his medically-imposed physical restrictions), led the board to conclude that the enforced leave was, in reality, an unlawful suspension—a guise masking prohibited personnel practices. Specifically, the board determined that the agency had: (i) unlawfully discri-

---

**3.** The record indicates that it was the line manager (plaintiff's supervisor) who had: (i) either initiated or was immediately involved in the agency's request for the "instant fitness" examination of plaintiff on August 12, 1977, (ii) certified, on August 23, 1977 (and subsequent dates) that no restricted work assignment was available to permit plaintiff's retention in the electrical shop, (iii) authored the initial "notice of proposed removal" of May 24, 1978, and, (iv) reinstituted the second attempted removal action in disregard of advice from the agency's Director of Industrial Relations that the case record would only tolerate a charge of "unauthorized possession of government property" (an offense for which no removal action would lie).

minated against an individual with a qualified physical handicap who was otherwise ready, willing and able to work and whose condition, according to the agency's own medical officer's testimony, could reasonably have been accommodated[4] and, (ii) manifested, through its continued inaction, prohibited retaliatory conduct taken in reprisal for plaintiff's exercise of his appeal and grievance procedure rights.[5] In short, the board found that plaintiff's enforced leave had been both prompted and sustained by unlawful personnel actions.

As to these findings and conclusions by the board, there is no dispute. Rather, the problem centers on the fact that, although the agency practices which the board condemned had begun prior to the date upon which plaintiff's disability retirement was finally rejected (October 18, 1979), nevertheless, the board deemed those practices actionable as an unlawful suspension only after that date. What led the board to adopt this time distinction was its view that, by initiating a disability retirement application plaintiff was, in effect, conceding that he was totally disabled for useful and efficient service in his position. As the board put it, the filing of the application was an "adoptive party admission that [he] was not ready, willing, and able to work * * *." Similarly, though for reasons less clearly articulated, the board found plaintiff ready, willing and able to work after his disability retirement application had

been rejected. Thus, at bottom, the reasoning was that, to the extent the enforced leave period coincided with plaintiff's voluntary pursuit of disability compensation, no adverse action could lie for the employee was, in reality, urging his own total disqualification for service. In short, the leave was more a matter of his own choosing than a wrongful constraint (*i.e.,* suspension imposed by agency action).

■ The board's reasons for terminating plaintiff's "voluntary" leave period upon the date his disability retirement application was finally rejected were, as already said, not clearly spelled out.[6] But that point is essentially irrelevant. The important question is whether the board was right in deciding, in the first instance, that the filing of an application for disability retirement signaled plaintiff's agreement with or acquiescence to the agency's enforced leave action.

The answer is "no"; the facts do not support the board's conclusion. To start with, the board itself had found that plaintiff was placed on leave "without his consent" meaning that, at that point in time (August 16, 1977), he was willing and available to perform his assigned duties. And nothing set forth in the later-filed disability application indicated any change of heart on his part. True, in the attending physician's statement which accompanied that application, plaintiff did recite that, because of the monocular restrictions "I am unable

---

**4.** Federal personnel regulations applicable to the events in this suit prohibited adverse actions against covered employees based on discrimination because of race, color, religion, sex, national origin, age "or for physical handicap with respect to any position the duties of which may be effectively performed by a person with the physical handicap." 5 C.F.R. § 752.104(c) (1977). Current law is to the same effect. See 5 C.F.R. § 752.403(b) (1982).

**5.** The board's reference was to 5 U.S.C. § 2302(b)(9) (Supp. V 1981), which prohibits the taking or the failing to take of "any personnel action against any employee * * * as a reprisal for the exercise of any appeal right granted by any law, rule, or regulation * * *."

**6.** It appears to have been the board's view that continuance of plaintiff's enforced leave without pay, following the final rejection of his

disability retirement application, amounted to an indefinite suspension. The conclusion was drawn from a Federal Personnel Manual guidance letter of September 12, 1980 (FPM Ltr. 752–11 at 7–8). However, that letter, as well as the authorities that it, in turn, recites (*i.e.,* 41 Comp.Gen. 774 (1962) and 38 Comp.Gen. 203 (1958)) only addressed the situation in which enforced leave was continued after *an agency's* application for disability retirement benefits (in behalf of the employee) had been rejected. Hence, it is very much an open question whether the same result (suspension) could be said to follow in the factual setting which the board thought present here, *i.e.,* a voluntarily submitted disability retirement application by the employee. We do not reach the question since we disagree with the board's factual premise.

to fill duties of my job description." But that statement falls far short of saying—as the board here had read it—that plaintiff was conceding he was neither ready, nor willing and able to perform *any* useful and efficient service within the range of duties comprehended by his job description.

Moreover, from the circumstances of this case, it should have been apparent that the statement simply mirrored the agency's actions rather than any judgment plaintiff had come to on his own. Indeed, the very filing of the application itself was shown to have been but a forced economic response to a denial of work rather than a self-guided pronouncement of inability to perform: "The shipyard put me out of the gate without a dime * * * I had no alternative." Finally, it needs to be noted that, immediately following the commencement of his unpaid leave status, plaintiff obtained employment in the civilian sector that involved work virtually the same as that for which the shipyard had found him disqualified. He held this job (ordnance technician) from September 1977 to January 1979.

Based on the several facts given here, the board's finding that plaintiff was not ready, willing and able to work must be overturned; the finding lacks substantial evidentiary support.

■ There remains for discussion whether plaintiff is entitled to back pay for that portion of the enforced leave period for which the board had denied relief on the erroneous premise that he was not ready, willing and able to work, *i.e.*, from the leave's commencement date (August 16, 1977) to the date that the board had marked as the beginning of the wrongful suspension (November 22, 1979). Stated otherwise, the question is whether this period of enforced leave was dictated by bona fide agency needs (*i.e.*, unavailability of any restrictive work assignments) or was, instead, like the period that followed, an unlawful suspension initiated and sustained for personal, disciplinary reasons.

For a part of this period the answer is clear. Inasmuch as the board had concluded that plaintiff's enforced leave was in-

spired by the same personal disciplinary reasons which had prompted the efforts to remove him, it follows that he is at least entitled to back pay as of May 24, 1978—the date the removal efforts were officially initiated. As to the state of affairs preceding May 24, 1978, the matter is less certain. Clearly, the evidence could be read to say that the same adverse motives which had sustained plaintiff's enforced leave status after May 24, 1978 were equally responsible for initiating that status in the first instance. But the state of the proof is not such as to require such a conclusion. That is, it could just as well be decided that immediate accommodation of plaintiff's physical limitations was not, in fact, possible thereby necessitating some or all of the enforced leave status up to May 24, 1978. Since the evidence might be judged either way, the factual determination that is called for is one that should be made by the board; not the court. *McCormack v. United States,* 204 Ct.Cl. 371, 381 (1974).

## CONCLUSION

For the reasons stated herein, the court holds that plaintiff was unlawfully suspended at least as of May 24, 1978 and is therefore entitled to reinstatement and back pay (with appropriate reductions for any interim earnings from outside employment) from that date through November 21, 1979. As to the period preceding May 24, 1978, further factual findings are required; for that purpose the matter must be remanded to the Merit Systems Protection Board pursuant to the United States Claims Court Rule 60.1(a) and (b).

With respect to plaintiff's request for attorney fees, the matter has not been briefed by either side; hence, we can reach no decision at this point. The statute involved —28 U.S.C. § 2412(d)(1)(B) (Supp. IV 1980) —allows the prevailing party who seeks an award of attorney fees to submit an application to the court within 30 days of final judgment. Accordingly, plaintiff may submit a follow-up application at that time together with such briefing as the impor-

tance of the question deserves.[7]  The separate claim for costs is also deferred to such later time.

As a last matter we add this thought: Given the Government's right to offset any back pay award by the amount earned by plaintiff through other employment during the enforced leave period, considerations of economy would plainly dictate that the parties resolve the remaining matters on their own rather than consume the time and expense involved in further administrative proceedings.  Accordingly, the Clerk of the Court is directed to stay the remand contemplated herein for a period of 60 days from the date of this opinion in order to allow the parties time to develop a stipulation for an entry of final judgment.

Plaintiff's motion for summary judgment is granted, in part, defendant's cross-motion is denied in its entirety, and the case is remanded to the Merit Systems Protection Board for further proceedings subject to the aforementioned stay for a period of 60 days.  Plaintiff's attorney of record shall report to the court the status of proceedings on remand at 90-day intervals.

---

7.  Under 28 U.S.C. § 2412(d)(1)(A) plaintiff is entitled to recover attorney fees associated with the prosecution of its claim here "unless the court finds that the position of the United States was substantially justified * * *."  Assuming that plaintiff has been compensated for attorney fees incurred at the administrative level, then entitlement here is hinged only to the question whether the Government's position *in this court* can be said to be without substantial justification.  Without meaning to express a final thought on the matter, we do think it doubtful that plaintiff can prevail where the Government's litigating posture is based entirely on defending an administrative decision in its favor.  *See Grace Baptist Church v. United States*, 1 Cl.Ct. 258 at 260 (Cl.Ct.1982).